# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARKEL AMERICAN INSURANCE COMPANY,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>BARRY FITT,<br><br>　　　　　　　Defendant. | CASE NO. 05CV1337 IEG<br><br>**MEMORANDUM DECISION AND ORDER** |

The above-entitled matter came before the Court for trial without a jury on October 2, 3, 10, 11, and 18, 2007. Neil S. Lerner, Esq. of Sands Lerner appeared on behalf of Markel American Insurance Company ("Markel" or "Plaintiff"). Peter J. Porter, Esq. of the Law Offices of Peter J. Porter appeared on behalf of Barry Fitt ("Defendant").

This memorandum decision constitutes the Court's findings of fact and conclusions of law.

## Introduction

This is an admiralty action centering on a marine insurance policy, Policy number YH 5005453-60 ("Policy" or "the Policy"), which Plaintiff issued to Defendant for his vessel the "Oceana Princess." On March 21, 2005, while the Policy was in effect—i.e. while Plaintiff was on the risk—the Oceana Princess sank five miles off the California coast.

In a Pretrial Order, which the Court signed March 26, 2007, the parties admitted to certain facts requiring no proof at trial. The Court incorporates by reference the facts admitted by the parties

and set forth in the Pretrial Order. The Court's findings of fact are based upon those facts admitted in the Pretrial Order and the testimony and evidence presented at trial.

## Jurisdiction

This Court has admiralty jurisdiction pursuant 28 U.S.C. § 1333 because Plaintiff's claim for rescission involves a marine insurance policy and is a maritime and admiralty claim pursuant to 9(h) of the Federal Rules of Civil Procedure. Venue is invoked in this Court because the subject insurance policy was issued in this district and because Plaintiff conducts business within this district.

## Findings of Fact

Defendant Purchases and Improves Oceana Princess

In 1996, Defendant purchased a yacht, the Oceana Princess, for $50,000. The Oceana Princess is a sixty (60)-foot-long wooden vessel, manufactured by Chris Craft, and originally built in 1962.

Subsequent to the purchase, Defendant undertook significant repair work on the Oceana Princess. During June and July of 1996, Defendant received assistance with certain repairs from Dwight A. Harrington, a shipwright and marine surveyor whom Defendant had met through professional boating activities during the 1980s.[1]

Insurance Coverage for the Oceana Princess

On October 31, 1997, Defendant submitted a signed marine insurance application to Fireman's Fund Insurance Company ("Fireman's Fund") through his agent Oversea Insurance Agency ("Oversea"). The application included a space for the name of the last person to survey the vessel and also asked for the replacement value and market value of the vessel based on the most recent survey. The application completed by or on behalf of the Defendant identified Dwight A. Harrington as the last person to survey the vessel and indicated the survey had taken place on August 11 and 13, 1996. Consistent with the figures reported on the 1996 Harrington survey, Defendant or his agent Oversea reported on the insurance application the yacht's replacement value as $900,000 and a market value of $225,000. The application also included a space for the Oceana Princess's purchase price, but that space was left blank. Beginning in 1997, Fireman's Fund insured the Oceana Princess.

---

[1] A shipwright builds and repairs ships. In contrast, a marine surveyor is charged with making observations of ships for the purpose of evaluating their condition and value.

1    In October of 2000, as Defendant's policy with Fireman's Fund approached the time for renewal, Fireman's Fund wrote to Defendant, informing him his vessel was due for a new condition and valuation survey. That letter offered to have the vessel surveyed by a Fireman's Fund staff surveyor. Defendant, through his agent Oversea, declined the survey offered by Fireman's Fund. Instead, a few months later, Defendant submitted another survey by Harrington, this one dated February 27, 2001. The 2001 Harrington survey reported an increase in the yacht's replacement value to $1.25 million as well as a rise in the market value to $312,500.

In a letter dated August 5, 2002, Plaintiff's president wrote to Defendant, informing him that Plaintiff was now underwriting the policy formerly placed with Fireman's Fund. The letter indicated Defendant could accept placement of his policy with Plaintiff by paying the renewal premium before the due date. Thomas Edward Conroy, currently the Marine Director for Plaintiff, testified that Plaintiff was contacted by Oversea on or before November of 2002 to inquire about insurance for the Oceana Princess.[2] This inquiry commenced a policy transfer. As part of the transfer, Oversea provided Plaintiff with the application Defendant had submitted to Fireman's Fund in 1997, along with the two Harrington surveys. Conroy testified that on the basis of the Fireman's Fund application and the two Harrington surveys, Plaintiff issued the Policy, which covered the Oceana Princess for a period of one year commencing on November 1, 2002. The Policy provided, inter alia, $200,000 of hull insurance coverage. Plaintiff annually renewed the Policy, providing coverage through November 1, 2005.

The Marina Cortez Litigation

During the period where Plaintiff provided coverage for the Oceana Princess, on June 29, 2004, Marina Cortez, Inc. ("Cortez")—the marina in which the Oceana Princess was moored—filed an in rem action against the Oceana Princess for more than $15,000 in unpaid slip fees. Cortez alleged Defendant had not paid slip fees since May of 2002. Defendant explained at trial that the outstanding obligation was not brought about by any financial trouble but rather out of a dispute with Cortez over the condition of its dock. Defendant's wife had sustained injuries on the dock and a personal injury

---

[2] It is unclear how Plaintiff was able to make contact with Defendant on August 5, 2002, if Oversea did not contact Plaintiff about taking over the policy until November of 2002.

1  case was ongoing at the time Cortez filed its action.

2  As a result of legal proceedings before Magistrate Judge McCurine, the Oceana Princess was
3  arrested and initially placed within the custodianship of the United States Marshall.  However,
4  consistent with a settlement agreement reached by the parties, Magistrate Judge McCurine later
5  returned custody of the vessel to Defendant and his wife in January 2005 so they could sell the yacht
6  to pay off the accrued slip fees as well as costs associated with the arresting of the vessel and legal
7  fees which had climbed to $47,697.57.  Pursuant to Judge McCurine's order, the boat would have to
8  be sold within six months.  If not sold within that time frame, it would be sold at auction in order to
9  satisfy the outstanding costs and legal fees owed by Defendant and Defendant would be personally
10 liable for any deficiency.

11  Over the next several months, Defendant undertook efforts to sell the boat.  On May 10, 2004,
12 he entered into a listing agreement with Pelican Yacht Sales ("Pelican") and provided Pelican with
13 a copy of the 2001 Harrington survey.  While the content of the 2001 survey in the Pelican file was
14 identical to the one on file with Oversea, the two surveys contained different signature blocks.  The
15 survey in the Oversea file contained the name "Dwight Harrington" in the signature block, while the
16 copy of the 2001 survey in the Pelican file listed the surveyor's name as "Dwight R. Harrington."

17  At trial, Defendant asserted that during this period he was in discussions with a man in New
18 York by the name of Neil Berg who was interested in partnering with Defendant and eventually
19 buying the Oceana Princess.  According to Defendant, Berg offered to pay $225,000 for the boat but
20 the two men were still negotiating terms of their arrangement.

21 <u>Condition of the Vessel After Its Arrest and Release to Defendant</u>

22  Upon its return from arrest, the Oceana Princess was moored at Harbor Island West Marina.
23  Woodrow Wilson, an employee at Defendant's resort,[3] testified that he visited the boat on
24 several occasions to perform cosmetic and mechanical work as well as deal with water incursions on
25 the vessel. Wilson testified that during this time period, the following items were removed from the
26 boat: a refrigerator, dining salon table and set of chairs, a dryer (which Wilson said did not work), a
27 mattress (which Wilson said contained mold and fungus), a trash compactor (which Wilson said did

28

---

[3]Defendant owned a mountain resort somewhere in California.

- 4 -                                                                05cv1337

not work), and a microwave (which Wilson said did not work). Wilson and Defendant both explained that items were taken off the boat either because they were in need of repair or replacement and that significant improvements, including new carpeting, were in store for the vessel. As for the water incursions, Wilson testified on at least three occasions he pumped rain water (and not ocean water) from the Oceana Princess. On his first trip, Wilson encountered approximately 250 gallons of water, which he pumped out by operating the ship's bilge pumps. During his second visit, Wilson encountered even more water, which he also pumped out by operating the bilge pumps. Wilson reported the boat seemed to be sitting deep in the water and leaning partially during this second encounter.

In the days preceding the sinking of the vessel, on March 18, 2005, and again on March 20, 2005, Defendant received phone calls from staff at Harbor Island West Marina, informing him his boat was taking on water.[4]

Sinking of the Oceana Princess

On March 21, 2005, Defendant and Wilson decided to take the Oceana Princess out to sea. The purpose of the trip, according to the testimony at trial, was to blow out the ship's carbon stacks in preparation for a change of the vessel's oil and an adjustment of the engine valves. In addition, Defendant testified the voyage would present an opportunity to teach Wilson about certain navigation concepts.

Before departing, the two men made certain preparations. Defendant testified that he checked the ship's bilge pumps and inspected the engine room and found no problems. In addition, Defendant and Wilson removed a hard bottom rescue boat from the yacht before setting out to sea. At trial, Defendant explained it was necessary to remove the rescue boat because its position, sitting alongside the carbon stacks, left it susceptible to collecting soot and dirt from the blowing out operation. In place of the hard bottom rescue boat, Defendant and Wilson brought onto the boat an inflatable rubber life boat along with a portable motor and a tank of gasoline. While Wilson had emergency flares in his truck, he neglected to bring those flares onto the boat.

---

[4]It is unclear whether some or all of Wilson's visits to the boat to deal with water incursions were initiated by these phone calls to Defendant.

1    Defendant and Wilson testified about the events that subsequently followed. They testified
2 that while at sea, approximately five to seven miles offshore, they heard and felt a large thump,
3 indicating to them the vessel had struck something in the water. Defendant testified that upon contact
4 with the unidentified object, he immediately went to the engine room to investigate. Finding no
5 problem, and finding the boat and its instruments were functioning normally, Defendant says he
6 headed back to the bridge and ate lunch with Wilson while the two men began to direct the vessel back
7 to the harbor. Approximately an hour later, according to both men, the vessel's electronics went out.
8 This prompted Defendant to again visit the engine room. Upon entering the room, Defendant found
9 it was taking on water which was already waist deep. Defendant explained that because of the water
10 and the loud action of the engines, he was unable to identify the source of the incursion. Defendant
11 next returned to Wilson and told him the boat was in trouble. The men attempted to broadcast a help
12 message but were unable because of the vessel's electrical problems. Attempts to contact help via a
13 cellular telephone were also unsuccessful. Fearing for their safety, Defendant and Wilson deployed
14 the inflatable rescue boat and abandoned the Oceana Princess.

15    After several hours, the vessel Dolphin came upon the men and alerted the Coast Guard to the
16 situation. The Coast Guard arrived on the scene approximately an hour later and both men were
17 transferred to a Coast Guard life boat. Wilson was subsequently able to climb from the life boat
18 aboard the Coast Guard vessel, the George Cobb, with the help of ladder. Defendant, because of a
19 physical disability, was unable to climb the ladder and instead was towed up alongside the deck of the
20 George Cobb while sitting inside the life raft, at which point he was able to slide onto the deck of the
21 Coast Guard vessel.

22    After boarding the George Cobb, Defendant received word that the Oceana Princess had sank.

23 <u>The Post-Accident Investigation</u>

24    After the sinking, Defendant filed a claim for coverage with Plaintiff.

25    Plaintiff in turn asked Russell Dennis to investigate the claim. Dennis had worked on an
26 hourly basis for Plaintiff on several occasions over his 25 year career in marine investigation. Dennis
27 first obtained a statement from both Defendant and Wilson in which the men described the
28 circumstances surrounding the boat's sinking. After obtaining those statements, Dennis testified that

1  he had doubts about the accuracy of the account and suspected there was more to the story. For one,
2  he questioned Defendant's true motivation for taking his boat out on the day of its sinking. Dennis
3  reported that he had never encountered someone taking a vessel out to sea based on a desire to blow
4  out carbon stacks. Another area of concern was the 1996 marine survey of the Oceana Princess which
5  Dennis had obtained from the insurance file.[5] Dennis testified that despite his long career as a marine
6  investigatory, he had never met or heard of Dwight A. Harrington, the author of the 1996 survey.
7  Based on these concerns, Dennis decided to locate Harrington to confirm the validity of the 1996
8  marine survey.

9        Dennis tracked down Harrington and arranged to meet with him at Harrington's home near
10 Templeton, California. At the time of their first meeting, Harrington lived in a trailer next to his
11 current restoration project, a 60 foot sailboat. The meeting took place in Harrington's nearby
12 workshop. During the meeting, Dennis showed Harrington the 1996 survey. After looking at it,
13 Dennis testified that Harrington got up, walked outside, came back in, and said "Barry, what have you
14 gotten yourself into this time." Then, he told Dennis that while he had worked on the vessel and
15 performed repairs in 1996, he did not generate the 1996 survey. Harrington noted he had no idea what
16 the acronym "SMS"—which appeared after his name at the top of the 1996 survey—meant. Dennis
17 reported Harrington appeared agitated and depressed about seeing the document and being involved
18 in the investigation but that he was cooperative when it came to answering questions. After their
19 discussion of the investigation, the men talked about other matters, including the upcoming
20 completion of Harrington's work on the sailboat and thus his pending unemployment. During this part
21 of the conversation, Dennis suggested that he may have work for Harrington as a surveyor somewhere
22 down the road.

23       Several weeks later, after a copy of the 2001 Harrington survey had been furnished to Dennis,
24 Dennis was instructed to return to Harrington and take a written statement.

25       After trying to call Harrington, Dennis went to Harrington's residence unannounced during
26 the morning hours of June 9, 2005. Both men recount that Harrington was not happy to see Dennis,

---

[5] At this point in time, Dennis apparently had only been given a copy of the 1996 survey and had not yet seen the 2001 survey, also authored by Harrington.

in part because the early morning call had roused Harrington from sleep. However, Harrington agreed to take a look at the second survey which Dennis had brought.

During their second meeting, which again took place in Harrington's workshop, Harrington indicated he had not generated the 2001 survey. According to Dennis, Harrington stated he was unfamiliar with the South Bay Shipyard, the purported location of the 2001 survey, and was similarly unfamiliar with various U.S. Coast Guard regulations which were referenced in the document.

Subsequently, Dennis told Harrington that Harrington would need to give a statement. He explained to Harrington that the investigation would not simply go away and if Harrington did not make a statement during their meeting, he would likely be subpoenaed to appear in Los Angeles for a deposition. Harrington acquiesced and Dennis, while asking Harrington questions, wrote out a statement and then asked Harrington to read and sign the statement. The statement explained, in Dennis's handwriting, that while Harrington did provide Defendant with findings for a survey in 1996, he did not actually fill out the form on which the 1996 survey appeared.[6] On the 2001 survey, the statement characterizes that survey as a "fake," explaining that Harrington "did not make the survey," "ha[d] never seen it," and "did not do it." At the bottom, in Harrington's handwriting, is the statement "I swear under penalty of perjury that the above statement is true and correct." Harrington was given a copy of the statement which Dennis testified was his custom and practice.[7]

Dennis testified Harrington read the statement in his presence before signing it and did not indicate his disagreement with any of its content. Dennis insisted he made no representations to Harrington that the statement was simply a draft which would be corrected and typed up later. Indeed, Dennis asserted at trial that never in his career had he taken a "draft" statement.

Harrington disputed Dennis's account, testifying at trial that he told Harrington the statement was not accurate but signed the statement nonetheless because Dennis represented to him that it was only a draft and that Harringotn would have the ability to later make changes. Harrington also contended at trial that his signing of the statement was the product of coercion by Dennis during the

---

[6]This statement regarding the authenticity of the 1996 survey apparently contradicts what Harrington told Dennis in their first meeting, which was that he was not involved in creating the content for the 1996 survey.

[7]Dennis used NCR paper, a paper akin to carbon paper, to generate two copies of the statement.

second interview, effectuated by threats that Harrington would be in trouble for participating in Defendant's attempt at insurance fraud and that he would be forced to go to Los Angeles and submit to a deposition. Harrington explained that the mixture of the early morning hour and Dennis's fast and aggressive style simply caused him to forget about the 2001 survey which he had completed during a particularly emotional time in his life. He stated that several months after the interview, Defendant refreshed his memory of the survey by reminding him of the specific circumstances surrounding it.

The Denial of Coverage

After Dennis's investigation concluded, in a letter dated June 30, 2005, Plaintiff informed Defendant of its decision to rescind and void the insurance policy it carried on the Oceana Princess. Plaintiff based its decision on Defendant's alleged breaches of the duty of good faith and full disclosure in the original insurance application to Fireman's Fund and the 2001 update. Plaintiff also alleged the sinking of the Oceana Princess fell within express exclusions to Defendant's policy. Finally, based on all the evidence, including the financial distress of Defendant in light of the Cortez litigation, Plaintiff found indicia of insurance fraud in the form of an intentional sinking.

**Procedural History**

On June 30, 2005, Plaintiff filed a complaint alleging causes of action for rescission of the Policy, voiding of the Policy, denial of benefits under the Policy's express terms, and a declaratory judgment that the Policy did not cover the loss of the Oceana Princess. Plaintiff's rescission and voiding claims were based on numerous alleged misrepresentations on the part of Defendant, including misrepresentations regarding the replacement value and market value of the Oceana Princess as reported in two marine surveys contained in Defendant's insurance file. In addition, Plaintiff's complaint alleged the Policy did not cover the loss of the Oceana Princess because the vessel's sinking was caused by certain excludable events, such as wear and tear, gradual deterioration, or Defendant's willful misconduct in either operating an unseaworthy vessel or intentionally scuttling the vessel. On September 30, 2005, Defendant filed an answer. Defendant included counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty.

On November 17, 2006, Plaintiff moved for summary judgment on the following: the

1  rescission claim, Defendant's counterclaims for breach of the covenant of good faith and fair dealing,
2  breach of fiduciary duty, and Defendant's plea for punitive damages. On December 5, 2006,
3  Defendant filed an opposition. Plaintiff filed its reply on December 11, 2006. The Court heard oral
4  argument on December 18, 2006. The Court granted Plaintiff's motion for summary judgment on
5  Defendant's counterclaims for breach of the implied covenant of good faith and fair dealing, breach
6  of fiduciary duty, and on Defendant's prayer for punitive damages. However, the Court denied
7  Plaintiff's motion for summary judgment on its rescission claim and set the matter for trial.

**Analysis**

**I.     Is Plaintiff obligated to pay benefits under the insurance policy?**

10  At trial, in addition to other theories of rescission, Plaintiff sought to establish that the
11 Harrington surveys were in fact authored and generated by Defendant, thus entitling Plaintiff to
12 rescission of the insurance policy. In the alternative, in addition to attempting to establish facts
13 relevant to voiding of the policy, Plaintiff attempted to establish that circumstances surrounding
14 the sinking of the Oceana Princess made it more likely than not that the vessel was intentionally
15 scuttled.

**A.     Rescission Claim**

17  Plaintiff's rescission claim is based on (1) Defendant's non-disclosure of the Oceana Princess's
18 purchase price on the original insurance applications; (2) the submission of the two Harrington
19 surveys, which Defendant labels fakes; or (3) concealment of material facts about the personal
20 relationship the surveyor, Harrington, had with Defendant.

21  The Court finds the second ground dispositive and thus addresses only that theory of rescission
22 in the following analysis.

i.     Legal Standard

24  In cases involving rescission of marine insurance contracts, federal admiralty law and
25 California law are "materially the same." <u>Certain Underwriters at Lloyd's v. Montford</u>, 52 F.3d 219,
26 222 n.1 (9th Cir. 1995). Under the doctrine of uttermost good faith (i.e., <u>uberrimae fidei</u>), a marine
27 insurance applicant "is 'bound, even if not asked, to reveal every fact within his/her knowledge that
28 is material to the risk.'" <u>Id.</u> at 222 (quoting <u>Wash. Int'l Ins. Co. v. Mellone</u>, 773 F. Supp. 189, 191

1  (C.D. Cal. 1990)).  The insurer may rescind the contract "'if it can show either [1] intentional
2  misrepresentation of a fact, regardless of materiality,[8] or [2] nondisclosure of a fact material to the
3  risk, regardless of intent.[9]'"  Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp., 159 F.3d 412, 420
4  (9th Cir. 1998) (quoting Mellone, 773 F. Supp. at 191).

5        Materiality depends "'solely [on] the probable and reasonable influence of the facts upon the
6  party to whom the communication is due[.]'"  C.N.R. Atkin v. Smith, 137 F.3d 1169, 1171 (9th Cir.
7  1998) (quoting Cal. Ins. Code § 334).  The inquiry centers on the response of the actual insurer, rather
8  than some hypothetical reasonable insurer.  N.H. Ins. Co. v. C'est Moi, Inc., 406 F. Supp. 2d 1077,
9  1083 (C.D. Cal. 2005).  To be material, the fact "must be something which would have controlled the
10 underwriter's decision to accept the risk."  Mellone, 773 F. Supp. at 191.  If, but for the undisclosed
11 fact, the insurer would not have underwritten the policy, the fact is material.  Trinh v. Metro. Life Ins.
12 Co., 894 F. Supp. 1368, 1372 (N.D. Cal. 1995); see Reliance Ins. Co. v. McGrath, 671 F. Supp. 669,
13 677 (N.D. Cal. 1987) (concealment is material where policy was issued in reliance on the
14 concealment).  Typically, a specific question on the application is sufficient to establish materiality.
15 C'est Moi, Inc., 406 F. Supp. 2d at 1083.  However, certain cases warrant an "inquir[y] into the nature
16 of the information withheld, and the likely practice of the insurance company had the concealed facts
17 been truthfully disclosed.  The test is the effect which truthful answers would have had upon the
18 insurer."  Taylor v. Sentry Life Ins. Co., 729 F.2d 652, 655 (9th Cir. 1984) (internal citations omitted).

19           ii.    Conclusions

20       The Court's conclusion regarding the authenticity of the surveys necessarily relies heavily
21 upon the Court's assessment of the credibility of witnesses Dennis and Harrington.  The Court finds
22 Dennis's testimony concerning his meetings with Harrington and the circumstances surrounding
23 Harrington's signing of the June 9, 2005 statement the more credible version of events.  The Court
24 concludes Harrington was properly informed and aware of the content of the written statement.

---

[8] Similarly, under California law, "[i]n marine insurance, if a representation by the insured is intentionally false in any respect, whether material or immaterial, the insurer may rescind the entire contract."  Cal. Ins. Code § 1904.

[9] Similarly, under California law, an insured must communicate "[a]ll the information which he possesses and which is material to the risk, except such as is exempt from such communication in the case of other insurance."  Cal Ins. Code § 1900(a).

Further, the Court finds no basis for Harrington's claim that he was coerced or conned by Dennis into signing a statement that he did not believe to be true. Dennis provided Harrington with a copy of the handwritten statement after Harrington had been instructed to sign the statement and affirm, in his own handwriting, that the statement was "true and correct." This level of formality was undoubtedly a clear indication to Harrington that the statement rose above the level of a mere "draft." Notably, Harrington never contacted Dennis thereafter to say he wanted to change any aspect of the statement. Further, Harrington's statement that his intention was to later correct the inaccuracies in the handwritten statement he signed is simply inconsistent with his competing claim that he realized the statement had errors many months later after his memory was refreshed by Defendant. On the one hand, Harrington claims he realized the statement about the 2001 survey being a fake needed to be revised at the time when he signed it, thus prompting him to ask Dennis for a chance to make future revisions. On the other hand, Harrington claims he realized only many months after signing the statement that the statement about the 2001 survey being a fake needed to be revised and only after Defendant jogged his memory. This inconsistency is further reason to doubt the historical accuracy of Harrington's testimony.

On the issue of whether Dennis somehow coerced Harrington into signing a false statement, the Court finds such allegations without significant evidentiary support. Harrington did not dispute that Dennis instructed him of his option to not give a statement. Harrington testified that Dennis nonetheless compelled him to participate in the creation and signing of the handwritten statement based on a threat that Harrington would be subject to further questioning during a deposition which might take place in Los Angeles. Accepting this verison of events, this "threat" simply does not rise to the level of conduct which would give this Court any reason to doubt the voluntariness or accuracy of Harrington's statement. Avoiding a potentially inconvenient trip to Los Angeles to participate in a deposition does not provide sufficient motivation to go along with a signed statement which unjustly accuses an acquaintance of 20 years of insurance fraud.

Thus, under the circumstances, the Court concludes Harrington's June 9, 2005 statement is competent evidence and provides substantial support for the conclusion that the 2001 survey was neither authored by Harrington nor derived from his work.

There is addition support for the conclusion that the 2001 survey is a fake. This evidence comes from the second version of the 2001 survey that appears in the files of Pelican, the Yacht broker that Defendant hired in 2004 to sell his boat (with the first version being the one that appears in the insurance files). In the version of the 2001 survey in the Pelican file, the signature line reads "Dwight R. Harrington, SMS." In comparison, the signature line in the version of the 2001 survey that was submitted to Oversea reads only "Dwight Harrington." This evidence tends to make it more likely than not that Defendant was simply generating surveys using Dwight Harrington's name and signature as opposed to simply keeping and distributing several identical copies of one authentic survey.

Based on the evidence, the Court finds that Harrington played no role in either providing content or filling out the 2001 survey contained in the insurance file and accordingly the survey is a fake.

Accordingly, the Court concludes the Plaintiff has shown by a preponderance of the evidence that Defendant intentionally misrepresented several facts material to the risk through his submission of fraudulent marine surveys. These surveys, and in particular the figures reported for market and replacement value, were used to justify the numbers reported on the Fireman's Fund insurance application. Notably, Harrington conceded during his testimony that the market values contained in the surveys were more than that reported for similar vessels in the leading price guide for used boats, the so-called BUC Book. The Court finds such fundamental information about a vessel, its market and replacement value, is material as a matter of law because such information unquestionably controls the underwriter's decision to accept the risk. Indeed, beyond these important values, the survey touches on other significant considerations of whether the vessel is a good marine risk, including the condition and seaworthiness of the vessel. See Mellone, 773 F. Supp. at 191 (facts controlling the decision to accept risk are material). Further, the testimony at trial establishes Plaintiff actually relied upon those values, in particular the values contained in the most recent survey (the 2001 survey), in its decision to insure the Oceana Princess. Accordingly, Defendant's submission of the fraudulent 2001 survey to Fireman's Fund and thereafter the Plaintiff constitutes an intentional and material misrepresentation which entitles Plaintiff to rescind the Policy. See Cigna Prop. & Cas. Ins.

1  Co., 159 F.3d at 420 (concealment of a material fact warrants rescission of an insurance policy).[10] The
2  forgery of the 2001 survey, the more recent statement on value and condition of the Oceana Princess,
3  is sufficient grounds to rescind the Policy. The Court therefore need not consider whether Harrington
4  indeed provided the content for the 1996 survey.

## Conclusion

For the foregoing reasons, the Court finds Plaintiff has established by a preponderance of the evidence that Defendant failed to disclose a material fact on his application and/or intentionally made a misrepresentation in his insurance application. Accordingly, Petitioner is entitled to rescission of the insurance policy. Judgment is entered in favor of the Plaintiff rescinding Policy Number YH5005453 in its entirety. Because the Court decides the case on this ground, it is unnecessary to consider Plaintiff's alternative theories based on other alleged misrepresentations or the claim that Defendant intentionally scuttled his vessel.

**IT IS SO ORDERED.**

DATED: December 18, 2007

*Irma E. Gonzalez*
**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

---

[10] Notably, Plaintiff has made a sufficient showing on either of the independent grounds upon which it may seek rescission: (1) an intentional misrepresentation, regardless of materiality and (2) the nondisclosure of a fact material to the risk.